Dr. Gustavo Muñoz Díaz, peticionario, *v.* La Corte de Distrito de Humacao, Hon. Gabriel Castejón, Juez, demandada.

No. 710.—*Sometido:* Mayo 5, 1930. *Resuelto:* Junio 8, 1931.

*L. Llorens Torres*, abogado del peticionario; *González Fagundo &
González Jr.*, abogado del ejecutante en el pleito principal.

El Juez Asociado Señor Texidor, emitió la opinión del tribunal.

Pedro Solá Colón presentó ante la Corte de Distrito de
Humacao una demanda contra Gustavo Muñoz Díaz y su esposa Inocencia René, en cobro de crédito hipotecario, por
el procedimiento ejecutivo sumario de la Ley Hipotecaria,
acompañando a su demanda varias escrituras y una certificación del registro de la propiedad de acuerdo con lo requerido por la legislación vigente en estos procedimientos. Pidió el requerimiento de pago con apercibimiento de subasta.
La corte ordenó tal requerimiento, que se llevó a cabo por el
márshal con relación a Gustavo Muñoz Díaz. Comparecieron los demandados y formularon la excepción previa de no
aducir la demanda hechos suficientes para determinar la
causa de acción ejercitada. Se oyó por la corte la excepción, y se resolvió declarándola sin lugar. Vencido el término del requerimiento, la corte a petición de la parte demandante decretó y ordenó la subasta de las fincas hipotecadas.

La parte demandada presentó moción para corregir la
minuta en el sentido de que lo que había quedado sometido
era una moción para que se eliminara la excepción previa,
y en suspenso el procedimiento, y nula la resolución de la
corte desestimando la excepción previa. La corte dictó resolución declarando que no había lugar a considerar la excepción previa por ser ella improcedente en un ejecutivo sumario, de acuerdo con el artículo 175 del reglamento de la
Ley Hipotecaria.

En 17 de marzo de 1930, la parte demandante pidió de
nuevo la subasta, a lo que accedió la corte. Y en 11 de abril
de 1930, se formuló la petición de *certiorari* acerca de la que
resolvemos.

██ En general, puede decirse que el fundamento principal de esta petición es la inconstitucionalidad del regla-

mento de la Ley Hipotecaria, alegada por la parte peticionaria.

El ataque más grave que se hace a la validez del Reglamento para la ejecución de la Ley Hipotecaria, es que no fué sometido al Consejo de Estado, y que este requisito era constitucionalmente necesario.

Como este extremo ha sido propuesto con gran habilidad, y a primera vista impresiona fuertemente, precisa entrar en su estudio con todo interés y detenimiento.

¿Qué misión tenía el Consejo de Estado, en relación con los reglamentos y con las instrucciones generales?

Sin remontarnos a la primitiva constitución del Consejo, ni a la historia de los organismos que le precedieron, encontramos en la ley de 17 de agosto de 1860, un artículo, el 45, que dice:

"Art. 45.—El Consejo de Estado será oído necesariamente y en pleno:

"1.—Sobre los reglamentos e instrucciones generales para la aplicación de las leyes y cualquiera alteración que en ellos haya de hacerse.

 * * * * * * *"

La ley de reorganización del Consejo de Estado, es de fecha 5 de abril de 1904.

La audiencia del Consejo de Estado era, por este artículo que citamos, necesaria. ¿Pero lo era para que los reglamentos o las instrucciones tuvieran validez? Para contestar esta pregunta es necesario ver qué efectos producía la opinión del Consejo de Estado.

El artículo 65 de la ley que venimos citando dice así:

"Art. 65.—En los Reales Decretos y órdenes que el Gobierno expidiere conformándose con el Consejo de Estado, reunido en pleno o en Secciones, se expresará esta circunstancia, y cuando no se conformase, se usará la fórmula 'Oído el Consejo pleno u oído el Consejo en Sesión de. . .'"

Por lo que aparece claramente de este precepto legal, el Consejo no dejó de ser lo que históricamente había sido: un

cuerpo de consulta, al que el Gobierno atendía, o no, sin que el informe favorable o adverso limitara la facultad del Ejecutivo para poner en vigor el reglamento. Es un cuerpo que asesora y opina, pero que no puede hacer efectivos su consejo o su opinión.

La constitución española de 1812, en su artículo 171, establecía en el Rey la facultad de expedir los decretos, reglamentos e instrucciones que considerase necesarios para la ejecución de las leyes. Esa misma facultad o poder aparece en el número 1º. del artículo 47 de la Constitución española de 1837, y en el mismo número del artículo 45, de la de 1845. Más marcada todavía aparece esa facultad en el artículo 75 de la Constitución de la misma Nación, del año 1869, en que se lee:

"Art. 75.—Al Rey corresponde la facultad de hacer reglamentos para el cumplimiento y aplicación de las leyes, previos los requisitos que las mismas señalen."

Y en la Constitución de 1876, vigente cuando se aprobaron la Ley Hipotecaria de que se trata, y el Reglamento para su ejecución, encontramos el número Primero del artículo 54, que como facultad del Rey fija lo siguiente:

"Primero.—Expedir los decretos, reglamentos e instrucciones que sean conducentes para la ejecución de las leyes."

Notamos que esta Constitución, ley suprema de la nación, y posterior a la ley de 17 de agosto de 1860, que reorganizó el Consejo de Estado, da al Rey la facultad o poder de hacer los reglamentos, sin cortapisas o limitaciones de ninguna clase. De forma que entendemos que constitucionalmente no sería nulo reglamento alguno publicado por un Real Decreto, aunque no hubiera sido oído el Consejo de Estado. Más aún; siendo éste un cuerpo meramente consultivo, como lo era desde su organización, su voto en contra del reglamento no tendría fuerza para anularlo.

El reglamento para la ejecución de la Ley Hipotecaria para las provincias de Ultramar, era válido, obligatorio y

eficaz, con su simple aprobación y expedición del Real Decreto. Esto no obstante se publicó con esta fórmula:

"Se aprueba el adjunto Reglamento para la ejecución de la Ley Hipotecaria de las provincias de Ultramar el cual regirá con carácter de provisional hasta que, oído el Consejo de Estado, se dicte el definitivo."

¿Anula esto el reglamento? Entendemos y decidimos que no. Aunque para nosotros es perfectamente clara la facultad del Monarca, en aquella época, para dictar los reglamentos, y aunque concediéramos alguna eficacia a la audiencia del Consejo de Estado, entendemos que nunca pudo haber duda de la facultad de dictar un reglamento de vigencia provisional, y que este carácter de provisional no tenía en ley alguna, limitación de tiempo. Y así llegó ese reglamento hasta la guerra con los Estados Unidos y la ocupación y posesión de Puerto Rico por el Gobierno de los Estados Unidos, en vigor definitivamente, según entendemos, o provisionalmente, según no tendríamos inconveniente en conceder para los fines de la argumentación.

En 13 de julio de 1898, el Presidente de los Estados Unidos se dirigió al Secretario de la Guerra, en una comunicación de la que copiamos el siguiente párrafo:

"Aunque los poderes del ocupador militar son absolutos y supremos y operan inmediatamente sobre el estado político de los habitantes, las leyes municipales del territorio conquistado, como las que afecten los derechos particulares del ciudadano y sus bienes y provean la penalidad por la comisión de delitos, se considerarán que continúan en vigor en tanto en cuanto sean compatibles con el nuevo estado de cosas, hasta que sean suspendidas o substituídas por el ocupador y en la práctica no son generalmente abrogadas sino que se permite que continúen en vigor y que sean administradas por los tribunales corrientes, tal cual estaban antes de la ocupación. Esta luminosa práctica debe seguirse en cuanto fuere posible en la presente ocasión. Los jueces y los demás funcionarios relacionados con la administración de justicia pueden, si aceptan la supremacía de los Estados Unidos, continuar administrando las leyes ordinarias del país, como las leyes de persona a persona, bajo la supervision del

comandante en jefe americano. La .Guardia Civil nativa en tanto fuere práctica será conservada. La libertad del pueblo a dedicarse a sus faenas ordinarias será limitada solamente cuando sea necesario hacerlo así.''

Este documento fué publicado en Puerto Rico. En la Orden General No. 1, de 18 de octubre de 1898, encontramos el siguiente párrafo:

''IX.—Las leyes provinciales y municipales, hasta donde afecten la determinación de derechos privados, correspondientes a individuos o propiedades serán mantenidas en todo su vigor, a menos que no resulten incompatibles con el cambio de condiciones realizado en Puerto Rico, en el cual caso podrán ser suspendidas por el Jefe del Departamento. Dichas leyes serán administradas materialmente, tales como existían antes de la cesión a los Estados Unidos. A este fin los jueces y demás funcionarios relacionados con la administración de justicia que juren fidelidad a los Estados Unidos, administrarán las leyes del país, en lo relativo a asuntos entre particulares; pero en los casos en que se negasen a prestar dicho juramento de fidelidad, o que delinquiesen en sus funciones o en otra forma el Jefe del Departamento ejercerá su derecho a destituirlos y nombrar a otros en su lugar. Para cooperar a la ejecución de las leyes provinciales y municipales, se conservarán los actuales organismos de Orden Público y Policía, hasta donde sea practicable y necesario, siempre que la lealtad de éstos a los Estados Unidos quede asegurada.''

En la ley para organizar temporalmente el gobierno civil de Puerto Rico, y proveer rentas y otros propósitos, que fué aprobada por el Congreso de los Estados Unidos el 12 de abril de 1900, encontramos una sección, la 8, que lee:

''Que las leyes y ordenanzas de Puerto Rico actualmente en vigor, continuarán vigentes, excepto en los casos en que sean alteradas, enmendadas o modificadas por órdenes militares y decretos vigentes cuando esta ley comience a regir, y en todo aquello en que las mismas no resulten incompatibles o en conflicto con las leyes estatutorias de los Estados Unidos no inaplicables localmente, o con las presentes disposiciones, hasta que sean alteradas, enmendadas o revocadas por la autoridad legislativa creada por la presente para Puerto Rico, o por una ley del Congreso de los Estados Unidos. . .''

En estado o condición de régimen definitivo, o en calidad aun de provisional, encontró esa ley al Reglamento para la ejecución de la Ley Hipotecaria para Ultramar; y así le dió toda la eficacia, toda la fuerza necesaria para continuar rigiendo en Puerto Rico como una verdadera ley, mientras no fuera derogada; y así lo ha tenido en su consideración el poder legislativo de Puerto Rico, introduciendo en él enmiendas como las de las leyes de 7 de marzo de 1912, 3 de diciembre de 1917, la número 21 de 1923 y otras, que parten de la consideración de la existencia y vigencia de ese reglamento.

Sin dar a este dato más valor que el que realmente tiene, conviene recordar la comunicación del Secretario de la Guerra de los Estados Unidos a la Cámara de Representantes en fecha 25 de febrero de 1909, en la que, respondiendo a la resolución de la Cámara de 6 de enero del mismo año, por la que se le requirió para que trasmitiera a aquel cuerpo colegislador, para su información, las leyes y ordenanzas, y las órdenes y decretos militares que afectaban a Puerto Rico, y a que se refiere la sección 8 del acta aprobada por el Congreso en 12 de abril de 1900, a que antes aludimos, el citado secretario incluye en esa legislación el reglamento para la ejecución de la Ley Hipotecaria de Ultramar.

En orden de importancia sigue a la cuestión que dejamos tratada, la referente a la interpretación que por el peticionario se da a los artículos 133 de nuestra Ley Hipotecaria, y 175 del Reglamento para su ejecución.

El artículo 133 de la ley, es como sigue:

"No se suspenderá en ningún caso el procedimiento ejecutivo por las reclamaciones de un tercero, si no estuvieren fundadas en un título anteriormente inscrito, ni por la muerte del deudor o del tercer poseedor, ni por la declaración de quiebra, ni por el concurso de acreedores de cualquiera de ellos."

El 175 del reglamento, así:

"Los procedimientos sumarios a que se refiere esta sección, no podrán suspenderse por medio de incidentes ni por otro alguno, a

instancia del deudor, del tercer poseedor, ni de ningún otro que se presente como interesado, salvo en los siguientes casos:

"1. Si se justificare documentalmente la existencia de un procedimiento criminal por falsedad del título hipotecario en cuya virtud se proceda, en que se haya admitido querella o dictado auto de procesamiento.

"2. Si se interpusiere una tercería de dominio, acompañando inexcusablemente con ella título de propiedad de la finca de que se trate, inscrito a favor del tercerista con fecha anterior a la inscripción del crédito del ejecutante y no cancelado en el registro.

"3. Si se presentare certificado del registrador, expresivo de quedar cancelada la hipoteca en virtud de la cual se proceda, o copia auténtica de la escritura pública de cancelación de la misma, con la nota de presentación en alguno de los registros en donde se haya de tomar razón de ella, otorgada por el actor o por sus causantes o causahabientes, acreditándose también documentalmente el título de transmisión en su caso.

"En el primer caso, subsistirá la suspensión hasta que termine la causa criminal, pudiéndose reanudar entonces el procedimiento si no quedase declarada la falsedad.

"En el segundo caso subsistirá hasta el término del juicio de tercería.

"En el caso tercero, el juez convocará a las partes a una comparecencia, debiendo mediar cuatro días desde la citación: oirá a las partes, admitirá los documentos que presenten, y acordará en forma de auto lo que estime procedente dentro de segundo día.

"Será apelable en ambos efectos este auto cuando ordenare la suspensión.

"Todas las demás reclamaciones que puedan formular, así el deudor como los terceros poseedores y los demás interesados, incluso las que versaren sobre nulidad del título o de las actuaciones, o sobre vencimiento, certeza, extinción o cuantía de la deuda, se ventilarán en el juicio plenario que corresponda, sin producir nunca el efecto de suspender ni entorpecer el procedimiento ejecutivo. La competencia para conocer de este juicio declarativo se determinará por las reglas ordinarias.

"Al tiempo de interponer la demanda, según el párrafo precedente, o durante el curso del pleito, podrá solicitarse que se asegure la efectividad de la sentencia, con retención del todo o una parte de la cantidad que por el procedimiento ejecutivo deba entregarse al ejecutante. . .''

La parte promovente sostiene que dado el texto del artículo 133 de la ley, en todos los que no sean los cuatro casos allí citados, se puede suspender el procedimiento ejecutivo sumario. Recuerda que en la precedente Ley Hipotecaria se establecía que el demandado en procedimiento ejecutivo hipotecario podrá formular las once defensas que para el procedimiento o juicio ejecutivo permitía la antigua Ley de Enjuiciamiento Civil Española. En realidad lo más importante que encontramos en la anterior Ley Hipotecaria en materia de procedimiento es el artículo 141, cuyo texto es:

"Art. 141.—Al vencimiento del plazo para el pago de la deuda, el acreedor podrá pedir que se despache mandamiento de ejecución contra todos los bienes hipotecados, estén o no en poder de uno o varios terceros poseedores; pero éstos no pueden ser requeridos al pago, sino después de haberlo sido el deudor y no haberlo realizado. Cada uno de los terceros poseedores si se opusiere será considerado como parte en el procedimiento respecto de los bienes hipotecados que posea, y se entenderá siempre con el mismo y el deudor todas las diligencias relativas al embargo y venta de dichos bienes debiendo el tercer poseedor otorgar la escritura de venta u otorgarse de oficio en su rebeldía. Será Juez o Tribunal competente para conocer del procedimiento el que lo fuese respecto del deudor. No se suspenderá en ningún caso el procedimiento ejecutivo por las reclamaciones de un tercero, si no estuvieren fundadas en un título anteriormente inscrito, ni por la muerte del deudor o del tercer poseedor, ni por la declaración de quiebra, ni por el concurso de acreedores de cualquiera de ellos."

Parece que tuviera entonces el deudor las defensas a que se alude por el promovente, dentro del procedimiento ejecutivo. Estas eran, según el artículo 1462 de la Ley de Enjuiciamiento Civil para Cuba y Puerto Rico, las siguientes:

1. Falsedad del título ejecutivo o del acto que le hubiera dado fuerza de tal.

2. Pago.

3. Compensación de crédito líquido que resulte de documento que tenga fuerza ejecutiva.

4. Prescripción.

5. Quita o espera.

6. Pacto o promesa.

7. Falta de personalidad en el ejecutante o en su Procurador.

8. Novación.

9. Transacción.

10. Compromiso de sujetar la decisión del asunto a árbitros o amigables componedores, otorgado con las solemnidades prescritas en esta ley.

11. Incompetencia de jurisdicción.

Y prevenía el mismo artículo que:

"Cualquiera otra excepción que competa al deudor se reservará para el juicio ordinario, y no podrá impedir el pronunciamiento de la sentencia de remate."

Por el momento debemos observar que la afirmación que hace el peticionario con relación a las once defensas, no puede sostenerse de una manera definitiva. Después de entrar en vigencia la Ley Hipotecaria, y visto el artículo 141, no es dudoso que la excepción de quita o espera no tiene eficacia alguna para suspender el procedimiento. La de compromiso de sujetar la decisión del pleito a árbitros o amigables componedores, no tendría hoy fuerza alguna. Las de falsedad del título y de pago aparecen reconocidas en el reglamento de la Ley Hipotecaria, y no las ha perdido el deudor, ni las ha interpuesto. Las de novación, transacción, y pacto o promesa de no pedir, no podrían, dentro de la Ley Hipotecaria, tener vida legal contra tercero a menos que esas alteraciones del primitivo contrato, aparecieran inscritas de acuerdo con el artículo 144 de la misma ley, y entonces, forzosamente resultarían de la certificación del registrador, documento que se ha de acompañar al escrito inicial del procedimiento, y que ha de tener presente el Juez para ordenar la expedición del requerimiento.

De todas formas, la excepción presentada no era ninguna de las once defensas de que habla la Ley de Enjuiciamiento Civil antigua; el peticionario siguió, para excepcionar, el procedimiento actual. Convenimos en que no era lógico seguir otro; pero no nos parece que pueda hacerse arma de

las excepciones del antiguo procedimiento, ni argumentar fundándose en ellas.

■■ Como se encontraba el procedimiento en las antiguas leyes Hipotecarias y de Enjuiciamiento Civil, el cobro de un crédito hipotecario sufría sus dilaciones y entorpecimientos; tenía las incertidumbres y producía las angustias que parecen ser desgraciada secuela de cualquier litigio. Se necesitó establecer algo que llevara esas angustias e incertidumbres a su mínima expresión; no por crear una clase privilegiada de acreedores, sino por razón de la importancia del crédito territorial. De todo esto responde el siguiente párrafo de la exposición que precede al proyecto de ley que se presentó en las cortes el 26 de mayo de 1893, y cuyo proyecto fué luego nuestra Ley Hipotecaria:

"Pero donde la voz de la experiencia se ha dejado oír con mayor fuerza contra la ley, demandando remedio pronto, es en lo referente al procedimiento para hacer efectivos los créditos hipotecarios. Su complicación abrumadora, la inseguridad del éxito y su coste incalculable, retraen al capital o sugieren condiciones usurarias; la venta a retro viene sustituyendo al préstamo, para suprimir todo procedimiento con daño del terrateniente; se estipulan intereses que triplican el capital prestado, y tal vez, empleando otras fórmulas, se sujeta con responsabilidades penales al deudor, convirtiendo la santidad de las leyes escritas para castigar delitos en vil instrumento de la codicia contra el infortunio. Emplea estas artes la desconfianza, porque el procedimiento legal no satisface las exigencias razonables de la contratación, y a cortar la raíz de estos males, proporcionar a la tierra el capital que necesita, y dar al prestamista seguridades de pronto y fácil cobro, se consagra la reforma de mayor transcendencia que propone el Gobierno, suprimiendo trámites que, sin garantía positiva de los derechos, ahoga los más sagrados. La previa tasación, la fijeza en la competencia judicial para las diligencias precisas, la supresión de todo pleito, un sólo requerimiento y la subasta inmediata, son las bases de la nueva legislación; suprímense juicios, exclusiones, exhortos, mandamientos de embargo de lo que está ya hipotecado, incidentes, subastas simultáneas y tantas otras barreras atravesadas en la senda del crédito territorial con noble ánimo, en las que sólo tropieza realmente la buena fe."

A evitar esa abrumadora complicación, ese coste de los pleitos, esa inseguridad, productores de un retraimiento de capital, o de simulaciones de contratos en los que el prestamista para asegurarse, tendía a aprisionar al prestatario, vino el procedimiento rápido y sumario que se creó en esta Ley Hipotecaria, en el que se empieza por suprimir la demanda ritual y formularia, para sustituirla por un escrito inicial, se continúa por permitir que el requerimiento se haga al que en cualquier concepto legal se halle al frente de la finca, cuando el deudor no reside en el lugar en que aquélla radique, o no se sepa su domicilio, se suprimen contestaciones e incidentes, y hasta se elimina la sentencia, ya que la orden que se dicta es un requerimiento de pago, y no una definición de derechos. Se concibe, puesto que la deuda está reconocida, la garantía subsistente, el valor de los bienes sobre que pesa la garantía fijada de antemano, y por acuerdo de los interesados, y realmente no quedan extremos de posible discusión y de obstáculo al procedimiento, salvo los tres casos de que hace mérito el artículo 175 del Reglamento.

No hay contradicción alguna entre la ley y su reglamento. Es más, en el último párrafo del artículo 128 de la ley encontramos lo que sigue:

"En el Reglamento para la ejecución de esta ley se determinarán los demás pormenores a que ha de ajustarse este sumario procedimiento."

Por cuyas palabras se ha creado por la misma ley toda la autoridad necesaria en el reglmento en lo que afecta a este procedimiento.

La ley ha dado los términos generales, y el reglamento no hace otra cosa que seguir, en el desarrollo de los detalles el pensamiento y el espíritu de aquélla. De ahí que en los artículos 168 a 176 inclusive, se establecen por el reglamento la forma y requisitos del escrito inicial, competencia, resolución del juez, etc.; y entre otros extremos indispensables, los necesarios a evitar que el procedimiento que se intenta sea

sumario, se convierta en un juicio declarativo corriente, o en el mejor de los casos, en un juicio ejecutivo. Por esa razón no se admite la discusión del título, la certeza, cuantía, extinción de la deuda, que la ley reserva expresamente a un juicio plenario, garantizado por la concesión de medidas aseguratorias de la efectividad de la sentencia, como se ve de los párrafos del artículo 175 del reglamento ya · citados.

En el caso de *Giménez* v. *Brenes,* 10 D.P.R. 128, este tribunal sostuvo la vigencia de la Ley Hipotecaria y su reglamento, de acuerdo con la Ley Orgánica votada por el Congreso de los Estados Unidos en 12 de abril de 1900; y dijo:

"La sección octava de dicha Ley Orgánica declaró vigente esa Ley Hipotecaria y ese Reglamento y por consiguiente implícitamente reconoció el Congreso que no podía derogarse ninguno de sus artículos sino por una ley especial como lo dispone el artículo 413 ya citado. De modo que toda la Ley Hipotecaria y con ella esa forma expresa de derogación tenía la indiscutible autoridad que le da nuestra Constitución votada por el Congreso de los Estados Unidos."

En el mismo caso se sostuvo que el procedimiento especial para el cobro de créditos garantizados con hipotecas está vigente hasta el requerimiento de pago al deudor, y no en la vía de apremio, o sea en cuanto a la forma de la venta de la finca gravada; y esta doctrina se confirmó en el caso *Banco Territorial y Agrícola* v. *Erwin,* 10 D.P.R. 412.

En el caso *Enrique Cueto* v. *La Corte de Distrito de San Juan,* 37 D.P.R. 244, se resolvió que en un juicio ejecutivo hipotecario no es procedente una contestación y contrademanda sobre hogar seguro; y se dijo:

" . . . los demandados no tienen derecho a presentar en este procedimiento ejecutivo hipotecario su alegación de contestación ni de contrademanda, por no referirse a ninguna de las cuestiones que están autorizadas en este procedimiento y por tanto no puede resolverse en él si en la finca hipotecada está constituído el hogar seguro de los demandados ni si el ejecutante está obligado a respetarlo. La alegación de los demandados requiere una contestación, la celebración de un juicio y una sentencia resolviendo la cuestión propuesta por los demandados, o sea un juicio ordinario dentro de un

procedimiento especial y sumario, lo que pugna con la naturaleza del juicio ejecutivo hipotecario y está en contra del artículo 175 citado.''

En estas condiciones, el juez que se niega a permitir la discusión de excepciones previas, o contestaciones u objeciones que no estén expresamente consentidas por el artículo 175 del reglamento para ejecución de la Ley Hipotecaria está en lo correcto; y ni extralimita su jurisdicción, ni comete error de procedimiento que autorice el auto final de revisión por *certiorari*.

*Debe declararse sin lugar el recurso, anulándose el auto dictado.*

El Juez Asociado señor Hutchison está conforme con el resultado.