# RCA Communications, Inc., recurrente, *v.* El Registrador de la Propiedad de Bayamón, recurrido.

Número 1320.

*Sometido:* 1 de junio de 1955. *Resuelto:* 28 de marzo de 1956.

*Fiddler, González & Nido* y *Richard J. González,* abogados de la recurrente; el Registrador recurrido compareció por escrito.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

RCA Communications, Inc., una corporación domiciliada en Nueva York y autorizada a hacer negocios en Puerto Rico, presentó en el Registro de la Propiedad de Bayamón para su inscripción, una escritura de arrendamiento redactada en inglés y en la cual dicha corporación comparecía como arrendataria. [1]

El Registrador de la Propiedad devolvió el documento sin practicar operación alguna y en su lugar tomó anotación preventiva por 120 días, [2] mediante la siguiente nota:

"Devuelto el presente documento sin practicar operación alguna por los fundamentos siguientes: Primero: Porque la escritura está hecha en idioma inglés y no se acompaña con la misma la traducción al castellano, y este Registro no cuenta con traductor oficial; y además el Registrador no viene obligado a calificar documentos que se le presenten para su inscripción, a menos que los mismos vengan redactados en idioma castellano, pues la ley número veintidós de dos de abril de mil novecientos veintisiete, página ciento cincuenta y nueve, dispone los requisitos que debe ostentar un Registrador de la Propiedad para desempeñar su cargo. Segundo: Porque las alegaciones expuestas en la presente escritura caen dentro de las disposiciones que refiere el artículo treinta y cuatro del Código de Enjuiciamiento Civil. Tercero: Porque los terceros que vienen al archivo del Registro a enterarse de los récords de las fincas inscritas o anotadas, son todas personas de habla española y muy pocos de ellos, saben leer y escribir el idioma inglés. Cuarto: Porque la Ley Hipotecaria puesta en vigor en Puerto Rico desde el primero de mayo de mil ochocientos ochenta, fué inspirada y enactada en idioma español para que los documentos presentados que fueran objeto de inscripción así se

---

[1] Con dicha escritura se acompañó otra de poder también en inglés ya que la corporación había comparecido en la de arrendamiento por medio de un apoderado.

transcribieran en los libros que habían de asegurar los derechos de terceros, y desde la vigencia de la misma su nomenclatura no ha sido modificada por legislación posterior alguna, a excepción de algunos artículos que han sido enmendados, siendo su Reglamentación igual a la de aquella fecha. Quinto: Porque en la Asamblea Constituyente reunida en el Capitolio para poner en vigor la Ley aprobada por el Congreso de los Estados Unidos, creando el Estado Libre Asociado de Puerto Rico, se dispuso en el Artículo I Sección I (página 35), lo siguiente: Al comenzar a regir esta Constitución todas las leyes que no estén en conflicto con la misma continuarán en vigor íntegramente hasta que sean enmendadas o derogadas o hasta que cese su vigencia de acuerdo con sus propias disposiciones; y extendida en su lugar por los motivos antes apuntados, la anotación preventiva por ciento veinte días que dispone la ley número treinta y nueve de veinte y tres de abril de mil novecientos veintiocho. Bayamón, Puerto Rico a quince de septiembre de mil novecientos cincuenta y cuatro.—(Firmado) Jesús J. Vergne Castelo.—Registrador Interino.—Derechos cancelados 50¢, No. 1°Arl.''

Para revisar esta nota la corporación arrendataria ha interpuesto el presente Recurso Gubernativo.

Los Registros de la Propiedad, fueron establecidos con este nombre en varios pueblos de Puerto Rico, por Real Decreto de 28 de febrero de 1879. La Ley Hipotecaria, para las Provincias de Ultramar fué establecida por Ley de 14 de julio de 1893 y por Real Decreto de 18 del mismo mes y año se aprobó el Reglamento. En virtud del art. 1ro. de esta Ley, quedaron subsistentes los Registros de la Propiedad en todos los pueblos en que se hallaban establecidos. Y ésta era la Ley vigente en Puerto Rico al verificarse el cambio de soberanía en el año 1898.(3) Consecuencia lógica de nues-

---

(2) Por resolución de este Tribunal en este mismo caso dicho período de 120 días fué prorrogado hasta tanto se resuelva este recurso.

(3) Muñoz Morales, Lecciones de Derecho Hipotecario, Tomo 1, pág. 24. Esa misma Ley Hipotecaria y su Reglamento continuó vigente después de la aprobación de la Ley Orgánica de 1900. *Giménez* v. *Brenes*, 10 D.P.R. 128; *Muñoz Díaz* v. *Corte*, 42 D.P.R. 384.

tro origen racial y de ser el español el único idioma oficial en la isla para aquel entonces, era la de que en este idioma se verificasen todos los asientos y operaciones del Registro. Ello no obstante, la Ley Hipotecaria autorizaba la inscripción en el Registro de documentos o títulos otorgados en países extranjeros([4]) y a este efecto dispone el art. 52 de su Reglamento que "Los documentos otorgados en el extranjero sólo podrán inscribirse después de ser oficialmente traducidos por la oficina de la interpretación de lenguas o por cualquier otro funcionario que para ello esté completamente autorizado." Pero al ocurrir el cambio de soberanía, se expidió la Orden General núm. 192 del Cuartel General del Ejército, Despacho del Ayudante General, Washington, D.C., de fecha 30 de diciembre de 1898,([5]) disponiendo que todos los documentos escritos en inglés y presentados para su inscripción en Puerto Rico, cuando vinieran acompañados de la correspondiente traducción al castellano tendrían, inscritos que fueran, la misma fuerza y validez que si hubieran sido otorgados en castellano. Parece ser claro que durante la vigencia de esta Orden General, el Registrador de la Propiedad no venía obligado a inscribir el documento o título escrito en inglés a menos que éste viniera acompañado de la correspondiente traducción al castellano.

■■ Estando ya en vigor la Carta Orgánica de 1900 (Ley Foraker), se aprobó por nuestra Asamblea Legislativa en 21 de febrero de 1902 para regir a partir del día primero de julio del mismo año, la "Ley con respecto al idioma que ha de emplearse en los departamentos, tribunales y oficinas

---

([4]) Artículo 5 de la Ley Hipotecaria.

([5]) Publicada en la Gaceta de Puerto Rico núm. 23 de 27 de enero de 1899. Dicha Orden General dispone:

"Por disposición del Secretario de la Guerra, todos los documentos ejecutados en inglés y presentados para su inscripción en Cuba y Puerto Rico, cuando vengan acompañados de la correspondiente traducción al castellano, tendrán, inscritos que sean, la misma fuerza y validez que si fuesen extendidos en castellano."

del Gobierno Insular." (⁶)   A partir de la vigencia de esta ley, los idiomas inglés y español se convirtieron en idiomas oficiales en Puerto Rico.   Dispone este estatuto que en todos los Departamentos del Gobierno Insular, en todos los tribunales de esta isla (⁷) y en todas las oficinas públicas con excepción de las oficinas municipales y de los tribunales municipales u oficinas dependientes de éstas, se emplearán indistintamente los idiomas inglés y español y que cuando sea necesario, se harán traducciones e interpretaciones orales de un idioma a otro.   La propia ley dispone además que para llevar a cabo sus disposiciones, todo Departamento, así como los tribunales y los Jefes de oficinas públicas emplearán, cuando fuere necesario, intérpretes y traductores competentes y que no podrá anularse ningún documento público o privado escrito en cualquiera de los dos idiomas por razón de aquél en que estuviese expresado.

---

(⁶) El texto completo de dicha ley es como sigue:

"Sección 1.   Que en todos los Departamentos del Gobierno Insular, en todos los tribunales de esta isla y en todas las oficinas públicas, se emplearán indistintamente los idiomas inglés y español; y cuando sea necesario, se harán traducciones e interpretaciones orales de un idioma al otro, de modo que las partes interesadas puedan comprender cualquier procedimiento o comunicación en dichos idiomas.

"Sección 2.   Que para llevar a cabo las disposiciones de esta ley, todo Departamento, así como los tribunales y los jefes de oficinas públicas emplearán, cuando necesario fuese, intérpretes y traductores competentes.

"Sección 3.   No podrá anularse ningún documento público o privado, escrito en cualquiera de los idiomas aquí mencionados por razón de aquel en que estuviese expresado.

"Sección 4.   La palabra 'escrito', según se emplea aquí, se entenderá a hacer referencia e incluir manuscritos, escritos a máquina (typewriting) e impresos y combinaciones de algunas o todas las formas de escrituras expresadas.

"Sección 5.   Nada de lo contenido en esta Ley será aplicable a las oficinas de ninguna municipalidad o a los tribunales municipales o de policía u oficinas dependientes de las mencionadas.

"Sección 6.   Esta Ley empezará a regir a partir del primero de julio de 1902.

"Aprobada, 21 de febrero de 1902."

(⁷) Por disposición del art. 34 de nuestro Código de Enjuiciamiento Civil, las alegaciones en los tribunales insulares pueden hacerse en lengua inglesa pero los escritos deben ser acompañados de las necesarias copias en lengua española, y las orales deben hacerse por medio de intérprete.

Esta ley autoriza la presentación en el Registro de la Propiedad, para su inscripción de aquellos documentos o títulos escritos en inglés que con arreglo a la Ley Hipotecaria sean inscribibles, sin necesidad de que los mismos vayan acompañados de las correspondientes traducciones al castellano. Siendo ello así, podemos concluír que la Orden General núm. 192, quedó derogada por la Ley del Idioma, conforme a la facultad que para ello tenía la Asamblea Legislativa de Puerto Rico bajo la Ley Foraker. Véase *Ex parte Rivera (a) Panchito*, 10 D.P.R. 211; *Pueblo* v. *Kent*, 10 D.P.R. 343.

■■ Ahora bien, en relación con la redacción de escrituras públicas, nuestra Ley Notarial dispone en su sec. 17 que "Las escrituras públicas se redactarán en lengua castellana, pero podrán hacerse en inglés, siempre que el notario y las partes y testigos conozcan ese idioma." Por su parte, la Ley de 10 de marzo de 1904, según fué enmendada por la Ley núm. 22 de 23 de abril de 1927, disponía que: "Para ser nombrado registrador de la propiedad de cualquier registro de la propiedad de Puerto Rico se requiere: ser ciudadano de los Estados Unidos de América, mayor de 25 años, abogado en el ejercicio con más de cinco años de práctica en las cortes de distrito y Corte Suprema de Puerto Rico, *y leer, escribir y hablar correctamente* el idioma castellano." (Bastardillas nuestras.) Refiriéndose al requisito de leer, escribir y hablar correctamente el idioma castellano, dice Muñoz Morales en su obra ya citada, a la página 53: "Tampoco se exigía este requisito en la Ley del 1893 [Ley Hipotecaria], que hoy fácilmente se comprende como necesario por el hecho de que, aun reconociéndose el idioma inglés como idioma oficial en la Isla, es lo cierto que toda documentación, con sólo algunas excepciones, está redactada en español; y en este idioma se verifican todos los asientos y operaciones en el Registro." Es probable que al requerir esta cualidad respecto al conocimiento del idioma castellano, el legislador considerara que los asientos y operaciones del Registro continuarían practicán-

dose en español. Sin embargo, este razonamiento carece hoy de valor. Nuestra legislatura acaba de aprobar la Ley núm. 3 de 2 de septiembre de 1955 titulada "Ley del Registro de la Propiedad del Estado Libre Asociado de Puerto Rico", en la que se elimina el requisito del conocimiento del idioma castellano para ser nombrado Registrador. Los únicos requisitos exigidos ahora por la ley, son (1) que la persona haya cumplido 25 años de edad; (2) haber sido admitida al ejercicio de la profesión de abogado por el Tribunal Supremo de Puerto Rico; (3) tener experiencia profesional, y (4) gozar de buena reputación. Art. 3 de la Ley núm. 3 de 1955. El Reglamento de este Tribunal tampoco exige el conocimiento del idioma castellano como requisito para admitir a una persona al ejercicio de la profesión de abogado en esta isla. Ya hemos visto que la Ley Hipotecaria, la Ley del Idioma y la Ley Notarial no prohiben que los asientos del Registro se practiquen en inglés. Por el contrario la Ley Notarial autoriza la redacción de escrituras públicas en inglés, y la Ley del Idioma dispone que en todas las oficinas públicas se emplearán indistintamente los idiomas inglés y español. Forzosamente hay que concluir que la legislación vigente no prohibe que los asientos y operaciones del Registro se practiquen en inglés. En su consecuencia, los registradores carecen de facultad para devolver un documento o título sin practicar operación alguna en el Registro por razón de que el documento presentado esté redactado en inglés y no se haya acompañado al mismo una copia traducida al castellano.

■ No hemos olvidado que una de las bases esenciales de la institución de los registros es dar publicidad a los derechos civiles que en ellos constan. *Criado* v. *Battistini*, 3 D.P.R. 195 (2da. ed.); 1 Morell, Legislación Hipotecaria, págs. 80 y 124. Puede argüirse que en términos generales esa publicidad sería menos efectiva en Puerto Rico si los asientos y operaciones del registro no se hicieren en el idioma

español ya que éste es nuestro idioma vernáculo. Sin embargo, la propia ley que convirtió en oficiales los idiomas inglés y español dispuso que "cuando sea necesario, se harán traducciones e interpretaciones orales de un idioma al otro, de modo que las partes interesadas puedan comprender cualquier procedimiento o comunicación en dichos idiomas". Para hacer viable esta disposición la misma ley proveyó que los jefes de oficinas públicas emplearan cuando fuere necesario intérpretes y traductores competentes. De suerte que la posibilidad de que el idioma inglés sea una limitación de la efectividad del principio de la publicidad de los registros se desvanece ante la obligación legal impuesta de emplear traductores e intérpretes competentes cuando fuere necesario.

De todos modos corresponde a la rama legislativa y no a este Tribunal determinar el idioma o idiomas en que deban hacerse las operaciones del registro y conforme al estado de la legislación actual, según hemos indicado anteriormente, dichas operaciones pueden practicarse en ambos idiomas indistintamente.

*Se revoca la nota recurrida y se ordena al Registrador de la Propiedad de Bayamón que proceda a calificar y a inscribir, si procediere, la escritura de arrendamiento presentada por la recurrente.*

---

Opinión concurrente del Juez Asociado Sr. Saldaña.

En la Ley Notarial (sec. 17), y en la Ley del Idioma que se aprobó el 21 de febrero de 1902, el poder legislativo estableció en forma clara y manifiesta las normas jurídicas que determinan cuál debe ser el contenido del fallo judicial en este caso: (1) en Puerto Rico una escritura pública puede hacerse en idioma inglés y es inscribible, y (2) el registrador de la propiedad está obligado a calificarla y a inscribirla en igual forma que si estuviese redactada en castellano, y, cuando sea necesario, debe hacer la traducción de modo que las partes interesadas puedan enterarse de su contenido.

El criterio de los jueces no tiene que coincidir con el de los legisladores para que una corte de justicia obedezca y aplique lealmente el único sentido recto y ecuánime de la ley. Además, permitir a un registrador que deniegue la inscripción de una escritura por el único fundamento de que está redactada en inglés equivaldría a dar a lo insignificante una grotesca importancia y a perder todo discernimiento de la realidad. La coexistencia de dos idiomas en Puerto Rico, como medios para llevar a cabo transacciones comerciales e industriales, se debe a realidades económicas que son palpables. Cualquier regla jurídica que impida el uso libre y efectivo del idioma inglés en los negocios sólo podría entorpecer nuestro desarrollo económico y ahogar las necesidades vitales de nuestro pueblo, sin beneficiar en nada a nuestra cultura. No hay que confundir la cuestión jurídica que plantea este caso con el problema de índole cultural que consiste en agregar un idioma a otro sin que ambos queden destruídos. Aun menos puede confundirse con el problema de nuestro *status* político.

En verdad, para Puerto Rico el bilingüismo es una necesidad económica y, si consideramos las cosas del espíritu, con dos idiomas no basta. Pero nada de eso tiene que ver con el punto que nos toca resolver aquí. La Asamblea Legislativa rechazó la estrechez de miras y la incapacidad para la vida práctica que ahora se pretende imponer por *fiat* judicial, a título de buen gusto, de respeto a la tradición y de ideas personales sobre la filosofía de la cultura. No podemos nunca derogar normas legislativas mediante interpretaciones espurias. Y en todo caso, si la interpretación de la ley se hiciera depender de las circunstancias prevalecientes en el momento de su aplicación o de las valoraciones personales de los jueces, el sentido de los textos cambiaría constantemente y se destruiría la certeza y la seguridad, raíz esencial de todo derecho.

La Constitución del Estado Libre Asociado de Puerto Rico no derogó, no modificó la Ley Notarial ni tampoco la Ley del Idioma. En consecuencia, no me explico cómo un registrador de la propiedad podría legalmente denegar la inscripción de una escritura por el único fundamento de que está redactada en inglés, aun suponiendo que en Puerto Rico —en 1956—los abogados y las demás personas que acuden a los registros de la propiedad desconocen dicho idioma. Tampoco tiene pertinencia jurídica el hecho de que el registrador no tenga ningún servicio organizado de traducción ni fondos asignados en el presupuesto para tales fines. Como la ley impone al registrador la obligación de calificar e inscribir una escritura redactada en inglés y, cuando sea necesario, el deber de hacer la traducción al castellano, de modo que cualquiera parte interesada pueda enterarse de su contenido, esas consideraciones no pueden pesar sobre la interpretación de los textos legales. Ni que decir hay que así también ha quedado convicta de error la teoría de que las normas legislativas vigentes destruyen el elemento de publicidad que, por supuesto, es una base esencial de la institución de los registros. Si es verdad que la función judicial se distingue por su naturaleza racional, tenemos que admitir que los preceptos legales aplicables en este caso no dejan al juzgador ningún margen de apreciación discrecional y que no existe ninguna indeterminación auténtica en la ley. Y en todo caso, la estimativa jurídica ideal no encontraría solución verdadera a los problemas jurídicos en el aislamiento, ni en la huída de este mundo, ni en la inversión de los valores que trae consigo el resentimiento, sino en la lucidez. Por las razones antes expresadas, concurro en la opinión de la mayoría.

---

Opinión disidente del Juez Asociado señor Belaval.

El señor Registrador de la Propiedad de Bayamón denegó la inscripción de un contrato de arrendamiento, del cual se solicitó inscripción, porque dicho contrato estaba redactado

en el idioma inglés y "los terceros que vienen al archivo del Registro a enterarse de los récords de las fincas inscritas o anotadas, son todas personas de habla española, y muy pocos de ellos, saben leer y escribir el idioma inglés". Entiendo que el señor Registrador de la Propiedad de Bayamón tiene razón. El elemento de publicidad que inspira todo el instituto hipotecario, quedaría totalmente defraudado, si partiéramos del supuesto que Puerto Rico es un pueblo bilingüe.

Como cuestión de realidad, Puerto Rico no es un pueblo bilingüe. No lo ha sido en el pasado, y después de la reciente rectificación de ciertas normas educativas, en el sentido que la educación básica del puertorriqueño debe ser en su idioma vernáculo, menos probabilidad tiene de serlo en el futuro. Además en este caso, está envuelto, no sólo el conocimiento vulgar de un idioma que no resulta nuestra lengua materna, sino el conocimiento técnico de una terminología jurídica, en su mayor parte, accesible solamente al grupo profesional de los peritos de la Ley. Si estamos conformes en que el Registro de la Propiedad es una institución que debe permanecer lo más accesible posible al entendimiento popular, como cuestión de realismo judicial, no podemos partir del supuesto bilingüista, como pretende la recurrente en este caso.

Para revocar la anotación preventiva del señor Registrador denegando la inscripción, la opinión de la mayoría se funda, en la norma legislativa contenida en la "Ley con respecto al idioma que ha de emplearse en los departamentos. tribunales y oficinas del Gobierno Insular" de 21 de febrero de 1902, que copiada en su totalidad dice así:

"Sección 1. Que en todos los Departamentos del Gobierno Insular, en todos los tribunales de esta isla y en todas las oficinas públicas, se emplearán indistintamente los idiomas inglés y español; *y cuando sea necesario, se harán traducciones e interpretaciones orales de un idioma al otro, de modo que las partes interesadas puedan comprender cualquier procedimiento o comunicación en dichos idiomas.*

"Sección 2. Que para llevar a cabo las disposiciones de esta ley, .todo Departamento, así como los tribunales y los jefes de

oficinas públicas emplearán, cuando necesario fuese, intérpretes y traductores competentes.

"Sección 3. No podrá anularse ningún documento público o privado, escrito en cualquiera de los idiomas aquí mencionados por razón de aquél en que estuviese expresado.

"Sección 4. La palabra 'escrito' según se emplea aquí se entenderá a hacer referencia e incluir manuscritos, escritos a máquina (typewriting) e impresos y combinaciones de algunas o todas las formas de escrituras expresadas.

"Sección 5. Nada de lo contenido en esta Ley será aplicable a las oficinas de ninguna municipalidad o a los tribunales municipales o de policía u oficinas dependientes de las mencionadas.

"Sección 6. Esta Ley empezará a regir a partir del primero de julio de 1902."

No puede haber duda que cualquier contrato puede ser redactado en español o en inglés. La comunicación entre contratantes que escojan el idioma que deseen para su contratación, no ofrece ningún problema de comunicación que deba ser regulado por el Estado. El problema surge cuando los contratantes interesan que el contrato llevado a cabo en un idioma libremente escogido por los contratantes, surta sus efectos contra terceras personas que desconocen dicho idioma, mediante su inscripción en un registro público.

Si fuéramos a interpretar la sec. 1 de dicha ley *at litteram*, el señor Registrador de la Propiedad de Bayamón también tendría razón, puesto que, uno de los fundamentos aducidos por él para denegar la inscripción es que "la escritura está hecha en idioma inglés y no se acompaña con la misma la traducción al castellano, y este Registro no cuenta con traductor oficial", y el propio texto de la ley establece que "cuando sea necesario, se harán traducciones e interpretaciones orales de un idioma al otro, *de modo que las partes interesadas puedan comprender cualquier procedimiento o comunicación en dichos idiomas.*" Como cuestión de realidad, no existe ningún servicio organizado de traducción para los Registros de la Propiedad, y el señor Registrador no tiene fondos asignados por presupuesto para tales servicios. . Es

obvio que, en tal caso, la única alternativa que le queda al señor Registrador, es exigirle al presentante que haga él la traducción y satisfaga los gastos correspondientes. Siendo la Ley Hipotecaria, como lo es, una ley de terceros, no tenemos más remedio que concluir, que en esta comunicación, resulta "parte interesada", todo el pueblo puertorriqueño.

Como se ve, aun cuando se trate de medios de comunicación tan cerrados, como suelen ser los que crean el expedienteo interdepartamental o los propios procedimientos judiciales, basta que una sola persona interesada no entienda el otro idioma, para que la comunicación o declaración sea traducida o interpretada. Sin embargo, la opinión de la mayoría es, que cuando se trate de darle conocimiento a toda una comunidad, sobre el estado de nuestra titulación inmobiliaria o de nuestra contratación sujeta a registro, se debe aplicar la norma permisiva del estatuto, en cuanto al uso indistinto de cualquier de los dos idiomas, pero no se debe aplicar la norma reparadora del propio estatuto, en cuanto a la traducción del documento, que es la que crea la igualdad de condiciones en el entendimiento.

La opinión de la mayoría parece partir del supuesto, que en el 1902, la norma que se estableció fué el uso indistinto de un idioma u otro, independientemente del entendimiento de las personas interesadas en la comunicación. No hay tal cosa. En el 1902, la norma que se estableció, fué el uso indistinto de un solo idioma, cuando la comunicación se realizaba entre instituciones o personas pertenecientes a un mismo cuerpo idiomático o poseedores del conocimiento del idioma oficial en que se realiza la comunicación y el uso simultáneo de los dos idiomas, cuando la comunicación se realizaba entre instituciones o personas pertenecientes a los dos distintos cuerpos idiomáticos, que no resultaban poseedores del conocimiento del idioma oficial envuelto.

Creo que ésta es una cuestión litigiosa, donde la aplicación de algunos principios del método histórico-evolutivo

podría darnos algunas inducciones provechosas para una interpretación judicial más cabal. Vide: Antonio Hernández Gil—Metodología del Derecho 185 *et seq.* (Editorial Revista de Derecho Privado 1954.)

En el 1902, cuando se aprueba la ley respecto al idioma oficial, vigente la Ley Foraker de 12 de abril de 1900, la relación política entre Estados Unidos y Puerto Rico, era una de metrópolis y posesión ultramarina, anexada a, pero que no formaba parte de, la nación norteamericana. Casi todos los nombramientos importantes de los funcionarios del Gobierno Insular eran de la potestad presidencial, y recaían en norteamericanos que no poseían el idioma español. La información relacionada con el estado de la vida pública de Puerto Rico, tenía que ser remitida a distintos ministerios del ejecutivo norteamericano, redactada en lengua inglesa. Mas los organismos oficiales no podían abstraerse a la realidad, que toda la información relacionada con el estado de la vida pública de Puerto Rico, estaba destinada también a servir los fines de una sociedad jurídica, de origen hispánico, y que la literatura oficial debía estar escrita en lengua española. Tal cuadro histórico impuso la norma que antes hemos enunciado: el uso indistinto de un solo idioma, cuando la comunicación se realizaba entre organismos o personas pertenecientes a un mismo cuerpo idiomático o poseedores del conocimiento del idioma oficial en que se realizara la comunicación y el uso simultáneo de los dos idiomas, cuando la comunicación se realizaba entre organismos o personas pertenecientes a los dos distintos cuerpos idiomáticos que no resultaban poseedores del conocimiento del idioma oficial envuelto. Con esto quedaba obviado el problema general de la comunicación.

En el 1954, cuando el señor Registrador de la Propiedad de Bayamón denegó la inscripción de la escritura redactada en el idioma inglés, está vigente la Constitución del Estado Libre Asociado de Puerto Rico del 25 de julio de 1952 y la

relación política entre Estados Unidos y Puerto Rico, es una de pueblos asociados, en virtud de un Estatuto de Relaciones Federales. No existe en el Estatuto de Relaciones Federales ninguna disposición sobre cuál debe ser el idioma oficial del nuevo Estado creado. Todos los nombramientos de los funcionarios del Gobierno Insular son de la potestad del Gobernador de Puerto Rico, y casi todos recaen en puertorriqueños que conocen el idioma español. La información relacionada con el estado de la vida pública en Puerto Rico, no tiene que ser remitida a los ministerios correspondientes del ejecutivo norteamericano, ni tiene que estar redactado en lengua inglesa, con excepción de las agencias federales que funcionan en Puerto Rico para cumplir con los fines federales de la asociación. Hoy, menos que ayer, los organismos oficiales del Gobierno Insular no pueden abstraerse de la realidad, que toda la información relacionada con el estado de la vida pública de Puerto Rico, está destinada a servir los fines de una sociedad política de origen hispánico, y la literatura oficial debe estar escrita en lengua española.

La confrontación histórica que hemos realizado, en vez de abogar por la libre elección de uno de los dos idiomas, cuando se trate de comunicaciones entre instituciones o personas pertenecientes a los dos distintos cuerpos idiomáticos, aboga en contra de dicha libre elección, puesto que hoy el problema de la comunicación no interfiere decisivamente con ningún aspecto funcional de la gestión pública, y la diversidad idiomática de cualquiera parte interesada puede ser mantenida para crear una más saludable comunicación, sin perjuicio del entendimiento popular.

La interpretación evolutiva de la anterior norma de 1902, del uso de un solo idioma, cuando no hay problema de comunicación y del uso simultáneo de los dos idiomas, cuando hay algún problema de comunicación, lo único que demuestra, es, que se trata de ese tipo de norma legislativa, que por haberse enfrentado valerosamente y con un respetuoso altruismo al

problema bastante complejo del bilingüismo oficial, resulta hoy, en su forma limitada de aplicación, más útil y aprovechable de lo que tal vez fué, en el momento de su adopción. De modo que, no tenemos por qué preocuparnos, si en este caso, la norma del 1902, con esta interpretación, pierde firmeza o estabilidad.

Con las normas relacionadas con el idioma oficial hay que tener cuidado. Casi siempre la discusión de las mismas trascienden del normativismo sin estimativas a los más serios problemas culturales y políticos de un pueblo. Los idiomas pertenecen más a una jurisprudencia estricta de valores que a una jurisprudencia de intereses, ya que en esta última, independientemente de su conveniencia en la consideración sociológica del Derecho, las estimativas obedecen más a la utilidad que al valor. Los idiomas están tan profundamente entrañados con los valores de la soberanía moral en el fondo del sujeto de derecho, que cualquiera imposición de un idioma oficial distinto al idioma natural del individuo, puede convertirse en una fuente inagotable de resentimiento, cosa que no resultaría saludable a los verdaderos fines de una asociación política entre pueblos.

Por el momento, mientras otra cosa no diga la evolución política del pueblo puertorriqueño, u otra cosa no se desprenda claramente de un nuevo pronunciamiento legislativo, debemos dejar toda declaración de indistinto uso idiomático en perjuicio del entendimiento popular, remitida al porvenir inmediato, y todo problema de dual tránsito lingüístico a su irremediable función en el terreno de la cultura, donde la penetración se realiza a través de estructuras de una más cabal comprensión del complejo humano. Cfr: *Self-Discovery in Puerto Rico*—Daniel J. Boorstein—The Yale Review—diciembre 1954.

Por las razones expuestas, lamento tener que disentir.